**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA,**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| **JAMES AREN DUCKETT &**<br>**DOMINICK OCCHICONE,**<br>        Plaintiffs,<br><br>v.<br><br><br>**RON DESANTIS, GOVERNOR**<br>**OF FLORIDA, ET, AL.,**<br>        Defendants.<br>_____/ | **CIVIL ACTION NO. _____**<br><br><br><br><br>**EMERGENCY INJUNCTIVE**<br>**RELIEF SOUGHT;**<br>**EXECUTIONS SCHEDULED**<br>**FOR JULY 28, 2026,**<br>**AT 12:00 P.M. AND 6:00 P.M.** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Plaintiffs James Aren Duckett and Dominick Occhicone, prisoners under sentences of death, hereby bring this action seeking injunctive relief and a declaratory judgment against Defendants Ron DeSantis, Richard Comerford, Randall Polk, and Mark Glass, each in their official capacity (collectively, the "State Actors"), and hereby state:

### INTRODUCTION

1. On July 28, 2026, the State of Florida intends to execute Plaintiffs James Aren Duckett and Dominick Occhicone just 6 hours apart. This sobering milestone marks not only the first time in 62 years that Florida will carry out executions of two death-sentenced individuals on the same day, but also the first

1

time it will do so using lethal injection.

2.    "The death penalty is the gravest sentence our society may impose," *Hall v. Florida*, 572 U.S. 701, 724 (2014), and there is no justifiable reason to carry out Plaintiff Duckett's and Occhicone's executions on such a compressed schedule where the risk for irreparable error is at its apex.

3.    Declaratory and injunctive relief from this Court are warranted to protect Plaintiff Duckett's and Occhicone's constitutional rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

**PARTIES**

4.    Plaintiffs James Aren Duckett and Dominick Occhicone are citizens of the United States and Florida. They are both indigent death-sentenced inmates in the custody of the Florida Department of Corrections ("FDOC") and incarcerated at Florida State Prison ("FSP") in Raiford, Florida, which is in the Northern District of Florida. Plaintiffs Duckett and Occhicone are scheduled to be executed via lethal injection on July 28, 2026, at 12:00 p.m. and 6:00 p.m., respectively.

5.    Defendant Ron DeSantis is the Governor of the State of Florida and the final executive authority in the state. As Governor, DeSantis is statutorily responsible for issuing death warrants and "directing the [FSP] warden to execute the sentence at a time designated [therein]." § 922.052(3), Fla. Stat. (2013). The Governor also has the power to stay executions. § 922.06(1), Fla. Stat. (1996).

DeSantis is being sued in his official capacity.

6.      Defendant Richard Comerford is the Secretary of the Florida Department of Corrections. Under Florida law, death sentences are "executed under the direction of the Secretary of Corrections or the secretary's designee." §922.105(1), Fla. Stat. (2025). Moreover, it is responsibility of the FDOC Secretary to periodically review and certify the Execution by Lethal Injection Procedures "to ensure proper implementation of the Department's statutory duties under Chapter 922, Florida Statutes." Exhibit 1. Comerford has been the FDOC Secretary since July 1, 2026, and is being sued in his official capacity.

7.      Defendant Randall Polk is the Warden of Florida State Prison. As FSP's warden, Polk is responsible for setting the date to execute an inmate's sentence "within the week designated by the Governor in the [death] warrant," § 922.11(1), Fla. Stat. (2000), as well as "handling support functions necessary to carry out the lethal injection process." Exhibit 1, p. 1. Polk is also statutorily responsible for designating the executioner, § 922.10, Fla. Stat. (2025), and either he "or a deputy designated by him . . . must be present at the execution." § 922.11(1), Fla. Stat. Polk is being sued in his official capacity.

8.      Defendant Mark Glass is the Commissioner of the Florida Department of Law Enforcement (FDLE). Under FDOC's execution protocol, FDLE agents are "responsible for monitoring the preparation of the [lethal] chemicals" and

3

"observing the actions of the execution team and the condition of the condemned inmate at all times during the execution process." Exhibit 1, p. 5. Glass is being sued in his official capacity.

## JURISDICTION AND VENUE

9.     This action arises under federal statute and presents federal questions within this Court's jurisdiction under Article III and 28 U.S.C. §§ 1331, 1343(a)(3). This action is being brought pursuant to 42 U.S.C. § 1983. This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Federal Rule of Civil Procedure 65.

10.     Venue is proper in the Northern District of Florida under 28 USC § 1391(b)(2) because the State Actors are all engaged in the actions at issue in this District, and all State Actors are residents of the District.

## STATEMENT OF FACTS

11.     Plaintiff James Aren Duckett was convicted of the 1987 sexual battery and murder of Teresa McAbee in the Fifth Judicial Circuit Court, in and for Lake County, Florida. Mr. Duckett was sentenced to death for the first-degree murder count following an advisory jury's 8–4 advisory recommendation. *Duckett v. State*, 568 So. 2d 891 (Fla. 1990).

12.     Plaintiff Dominick Occhicone was convicted of two counts of first-degree murder for the 1986 deaths of Raymond and Martha Artzner in the Sixth

4

Judicial Circuit Court, in and for Pasco County, Florida. Mr. Occhicone received a sentence of life in prison without the possibility of parole for 25 years for the death of Raymond Artzner but was sentenced to death for killing Martha Artzner following a jury's advisory recommendation of 7–5. *Occhicone v. State*, 570 So. 2d 902 (Fla. 1990), *cert. denied*, 500 U.S. 938 (1991).

13.   On February 27, 2026, Defendant DeSantis signed a death warrant for Plaintiff Duckett, designating the week beginning at 12:00 noon on Tuesday, March 31, 2026, through 12:00 noon on Tuesday, April 7, 2026, for his execution. As FSP's warden, Defendant Polk set the date and time of Mr. Duckett's execution for Tuesday, March 31, 2026, at 6:00 p.m. Exhibit 2.

14.   On March 26, 2026, the Florida Supreme Court entered an Order granting Mr. Duckett's motion to stay his execution due to DNA testing of biological evidence permitted by the circuit court. *Duckett v. State*, 428 So. 3d 40 (Fla. 2026); *Duckett v. State*, 431 So. 3d 900 (Fla. 2026). This stay remained in effect until the Florida Supreme Court disposed of Mr. Duckett's 3.851 appeal and habeas petition filed under warrant and vacated the stay on July 8, 2026. *Duckett v. State*, SC2026-0449 & SC2026-0450, 2026 WL 1970442, at *1 (Fla. July 8, 2026).

15.   In the nearly 5 months since Mr. Duckett's warrant was signed, Defendant DeSantis has issued death warrants for 8 more Florida inmates, including Chadwick Willacy (DC# 707742), James Hitchcock (DC# 058293), Richard Knight

(DC# L36346), Andrew Lukehart (DC# 391485), Dusty Ray Spencer (DC# 321031), Dennis Sochor (DC# 639131), William Silvia (DC# 512579), and Plaintiff Occhicone.

16.    In addition to executing 2 others who were already under active death warrants when Mr. Duckett's warrant was signed, Billy Leon Kearse (DC# 138315) and Michael King (DC# 132254), FDOC has carried out the sentences of each individual named in ¶ 15, except Mr. Silvia's[1] and Plaintiff Occhicone's.

17.    Defendant DeSantis issued the death warrant for Plaintiff Occhicone on June 26, 2026, designating the week beginning at 12:00 noon on Tuesday, July 28, 2026, through 12:00 noon on Tuesday, August 4, 2026, for his execution. Defendant Polk set the date and time of Mr. Occhicone's execution for Tuesday, July 28, 2026, at 6:00 p.m. Exhibit 3.

18.    Meanwhile, in a letter dated July 14, 2026, the Attorney General for the State of Florida, James Uthmeier, notified Defendant DeSantis that the stay of execution in Mr. Duckett's case had been lifted and that "the record [was] legally sufficient to support the setting of a new execution date." Exhibit 4, p. 3-4.

19.    That same day, Defendant DeSantis issued a letter resetting Mr. Duckett's execution, designating the week beginning at 12:00 noon on Tuesday, July

---

[1] Defendant DeSantis issued Mr. Silvia's death warrant on July 17, 2026. Mr. Silvia is not scheduled to be executed until August 18, 2026.

28, 2026, through 12:00 noon on Tuesday, August 4, 2026, for the sentence to be carried out. Defendant Polk set the date and time of Mr. Duckett's execution for Tuesday, July 28, 2026, at 12:00 noon. Exhibit 4, p. 1.

20.    Plaintiffs Duckett and Occhicone are now set to be executed on the same day, July 28, 2026, just 6 hours apart. If these executions proceed as scheduled, it will be the first time the State has carried out two capital sentences in the same day in the modern era. *See* Execution Database, Death Penalty Info Ctr., https://deathpenaltyinfo.org/facts-and-research/data/executions?state=Florida& federal=No&page=3 (last updated July 21, 2026); *see also* Hayley Bedard, *Florida Sets Two Executions for the Same Day*, Death Penalty Info. Ctr. (July 20, 2026), https://deathpenaltyinfo.org/facts-and-research/data/executions?state= Florida&federal=No&page=3 (noting that "[t]he last time Florida carried out two executions on the same day was with the electric chair in 1964").

### A.    Florida's Procedure for Issuing Death Warrants and Scheduling Executions

21.    Florida law vests the Governor with the sole authority to issue death warrants and designate the time period for executing a capital sentence. § 922.052, Fla. Stat. This same statutory provision authorizes a warrant period of up to 180 days. *Id.*

22.    Once the Governor signs a death warrant, it is transmitted to the warden of Florida State Prison where all executions in the state take place. Upon

7

receipt of the warrant, the warden is required to "set the day for execution within the week designated by the Governor . . . ." § 922.11(1), Fla. Stat. (2000). The law and any other publicly available materials are silent as to any other factors governing the warden's selection of an execution's date and time. *Id.*

23.     Under section 922.105(1), Florida Statutes (2025), "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." Florida's current three-drug protocol for lethal injections consists of a series of etomidate, rocuronium bromide, and potassium acetate injections. Exhibit 1.

24.     Neither Mr. Duckett nor Mr. Occhicone have elected death by electrocution and stand to be executed by lethal injection on July 28, 2026, at 12:00 p.m. and 6:00 p.m., respectively. Their sentences will be executed under the direction of Defendant Comerford as FDOC Secretary or his designee. § 922.105(1), Fla. Stat.

### B.     Florida's Lethal Injection Procedures

25.     FDOC's Execution by Lethal Injection Procedures (hereinafter Lethal Injection Procedures) were last certified by former Secretary Ricky D. Dixon on February 18, 2025.[2] Exhibit 1. Former Secretary Dixon's letter to Defendant

---

[2] FDOC's Lethal Injection Procedures have been effectively the same since January 2017 when the agency replaced Midazolam with Etomidate as the first drug in the three-drug protocol. Exhibit 1.

DeSantis accompanying the protocol certified that:

> The procedure has been reviewed and is compatible with evolving standards of decency that mark the progress of a maturing society, the concepts of the dignity of man, and advances in sciences, research, pharmacology, and technology. The process will not involve unnecessary lingering or the unnecessary or wanton infliction of pain and suffering. The foremost objective of the lethal injection process is a humane and dignified death. Additional guiding principles of the lethal injection process are that it should not be of a long duration, and that while the entire process of execution should be transparent, the concerns and emotions of all those involved must be addressed.

Exhibit 1.

26.    Former Secretary Dixon further certified that "[t]he Department is prepared to administer an execution by lethal injection and has the necessary procedures, equipment, facilities, and personnel in place to do so." Exhibit 1. This means that FDOC "has available the appropriate persons who meet the minimum qualifications under Florida Statutes and in addition have the education, training, or experience, including the necessary licensure or certification, required to perform the responsibilities or duties specified and to anticipate contingencies that might arise during the execution procedure." Exhibit 1.

27.    FDOC's Lethal Injection Procedures advise that "[t]here will be a review of the lethal injection procedure by the Secretary of the Florida Department of Corrections, at a minimum of once every two years, or more frequently as

needed." Exhibit 1, p. 14. This "review [is required to] take into consideration the available medical literature, legal jurisprudence, and the protocols and experience from other jurisdictions." Exhibit 1, p. 14.

28. To the best of Plaintiffs' knowledge, Defendant Comerford has not yet undertaken this periodic review of Florida's Lethal Injection Procedures since assuming his role as FDOC Secretary on July 1, 2026. Moreover, Defendant Comerford has only overseen one execution as FDOC Secretary during his tenure thus far, which was the execution of Dennis Sochor by lethal injection on July 14, 2026.

29. Florida's Lethal Injection Procedures define the roles of the "Execution Team," the "Executioner," the "Institutional Warden" (Defendant Polk), and the "Team Warden" responsible for carrying out an execution.

30. The "Execution Team" refers to "correctional staff and other persons who are selected by the team warden designated by the Secretary to assist in the administration of an execution by lethal injection, and who have the training and qualifications, including the necessary licensure or certification, required to perform the responsibilities or duties specified." Exhibit 1, p. 1.

31. The "Executioner" refers to "an individual selected by the team warden to initiate the flow of lethal chemicals into the inmate." As explained in the procedures, "[t]he executioner's sole function is to inject the chemicals into the IV

10

access port by physically pushing the chemicals from the syringe," and he or she "is only authorized to carry out this specific function under the direction of the team warden." Exhibit 1, p. 1.

32. The "Institutional Warden" is the warden of FSP, "who shall be responsible for handling support functions necessary to carry out the lethal injection process." Exhibit 1, p. 1. As noted above, the Institutional Warden is Defendant Polk, and he has been in this position since December 2025.

33. Lastly, the "Team Warden" refers to "the warden designated by the Secretary" who "has the final and ultimate decision making authority in every aspect of the lethal injection process." Exhibit 1, p. 2.

34. The Lethal Injection Procedures further provide that "[t]wo (2) FDLE agents shall serve as monitors and shall be responsible for observing the actions of the execution team and the condition of the condemned inmate at all times during the execution process. Exhibit 1, p. 5. "The first FDLE agent shall be located in the executioner's room and is responsible for observing the preparation of the lethal chemicals and documenting and keeping a detailed log as to what occurs in the executioner's room at a minimum of two (2) minute intervals." Exhibit 1, p. 5. "The second FDLE agent shall be located in the execution chamber and will be [likewise] responsible for keeping a detailed log of what is occurring in the execution chamber at a minimum of two (2) minute intervals." Exhibit 1, p. 5.

11

35.    The Lethal Injection Procedures, as well as sections 945.10(1)(g) and (j), Florida Statutes (2024), explicitly shield the identities of the Execution Team, Executioner, Team Warden, and FDLE monitors from public disclosure. The qualifications and licensure of any individual involved with an execution are absent from the protocol and likewise unknown.

36.    The Lethal Injection Protocol calls for successive intravenous injections of 200 milligrams of etomidate, a sedative, followed by 1000 milligrams of rocuronium bromide, a paralytic agent, and 240 milliequivalents of potassium acetate, which stops the heart. Exhibit 1, p. 6-7.

37.    On the day of the execution, the designated executioner will prepare syringes with the required dosages to dispense during the lethal injection. That executioner is also instructed to prepare a second set that is not administered unless expressly ordered to by the team warden. Exhibit 1, p. 6-7.

38.    The source of the drugs used in Florida's Lethal Injection Protocol is unknown, and the identity of the pharmacy that manufactures the chemicals used by Defendants in executions in confidential. § 945.10, Fla. Stat.

39.    Thirty minutes before the execution is set to begin, a designated staff member will gain venous access to the prisoner through each arm. Exhibit 1, p. 9. One arm will be connected to a primary IV line, and the second arm will be connected to a secondary line. *Id.* If the staff member cannot obtain IV access

through the prisoner's arms, the procedures authorize that person to seek peripheral venous access by trying "other appropriate sites." *Id.* If peripheral venous access cannot be achieved, the procedures authorizes the staff member to gain access to the prisoner's veins through a cut-down method, wherein executioners cut directly into the prisoner's skin to insert the IV cannula. *Id.*

40.     Multiple parts of the prisoner's body will be strapped down to the gurney, and their fingers will be taped down with a bandage binding his or her hands to the gurney to hide observable movement. Two heart monitors will be strapped to the prisoner's chest, to be monitored in a smaller room adjacent to the execution chamber, out of sight from witnesses. Exhibit 1, p. 9.

41.     When the execution begins, a curtain will open, allowing witnesses to view the prisoner. Exhibit 1, p. 11. The executioner will administer the drugs from the smaller room. *Id.* The drugs will travel through a long stretch of IV tubing to reach the prisoner's veins.

42.     The procedure begins with the injection of etomidate from two syringes containing 100mg of etomidate each. Exhibit 1, p. 10-11. After that dosage is administered, the team warden will assess whether the prisoner appears sufficiently unconscious. *Id.* at 11.

43.     If the team warden determines that the prisoner is still conscious, the execution team will assess the viability of the secondary IV line and perform a

13

cutdown procedure if that access point is compromised. *Id.* This will occur out of view from the witnesses. *Id.* Once an IV is again set, the process will continue, and etomidate will be injected a second time. *Id.*

44.     If at that point the team warden is satisfied with the prisoner's appearance of unconsciousness, the execution will proceed. From the adjacent small room that is out of sight from the witnesses, the executioners will continue and administer 1000mg of rocuronium bromide and 240 milliequivalents of potassium acetate with syringes of saline solution in between. *Id.* at 11-12.

45.     When the heart monitors reflect a flat line reading, a physician will then inspect the prisoner to determine if he or she is still breathing and if there is a heartbeat. *Id.* at 13. That physician will pronounce the prisoner dead, concluding the execution. *Id.*

46.     The Lethal Injection Procedures certified by former Secretary Dixon on February 18, 2025, do not address multiple executions being carried out on the same day.

**C.     FDOC's Policies for Inmates Under Warrant on Their Execution Day**

47.     FDOC policies promulgated by Defendant Polk provide the schedule for inmates on the day of their execution. Exhibit 5. Included in this schedule are final social visits with the inmate's family or friends and visit with the inmate's spiritual advisor.

48.     As to final social visits, the policy states that on "[t]he morning of the scheduled execution, social visits will be non-contact from 8:00 a.m. – 10:00 a.m." Exhibit 5. The policy additionally advises that "[a] final contact visit for the condemned inmate may be authorized by the Institutional Warden based on circumstances as deemed appropriate, from 10:00am until 11:00am." Exhibit 5.

49.     As for the final religious visit, the policy states that on "[t]he day of the scheduled execution, religious visits by the designated religious leader will be non-contact, [with the] option for [a] contact visit cell front at [the] discretion of [the] institutional warden, during the hours of 12:00 pm – 2:00 pm." Exhibit 5.

50.     FDOC policy states that the times described in ¶ ¶ 48 and 49 "are approximate and subject to change according to the time of the execution." Exhibit 5. Like its Lethal Injection Protocols, FDOC's scheduling policy does not address the logistics for carrying out multiple executions on the same day.

51.     As such, after receiving notice that his execution date and time had been reset for 12:00 p.m. on July 28, 2026, Plaintiff Duckett immediately contacted Defendant Polk's assistant to inquire what the schedule would be for his final visit with his family and spiritual advisor. Defendant Polk's assistant thereafter informed Plaintiff Duckett via email that his final visit with his family would be on Monday, July 27, 2026, from 9:00 a.m. – 12:00 p.m. and that his visit with his spiritual advisor would be on the day of his execution from 6:00 – 8:00 a.m. Exhibit 6.

52.    Absent any change to his execution date or time, Plaintiff Duckett will be the only death-sentenced inmate who does not get the opportunity to see his family on the day the State of Florida intends to kill him.

### D.    The Historical Anomaly of Double Executions in the United States

53.    Conducting more than one execution on the same day is exceedingly rare and has only occurred *once* since the year 2000 when Arkansas executed Jack Harold Jones, Jr., and Marcel Wayne Williams via lethal injection on April 24, 2017. *See* Execution Database, Death Penalty Info. Ctr., https://deathpenaltyinfo.org/facts-and-research/data/executions (last updated July 23, 2026). The inherent difficulties and concerns arising from the practice has prompted several states to adopt rules expressly prohibiting it.

54.    For instance, in 2014, Oklahoma attempted a double execution, which resulted in the botched execution of Clayton Lockett. The Lockett execution led to an investigation by the Oklahoma Department of Public Safety, who determined that the intravenous lines were mishandled for several reasons, including the "extra stress" stemming from the pressure of 2 executions on the same day. Exhibit 7, p. 23. This investigation resulted in a recommendation that "executions should not be scheduled within seven calendar days of each other" and that there be a sufficient time between executions for a review in which "all involved personnel [may] voice their opinion, concerns, and/or recommendations in order for continuous

16

improvement to the process." Exhibit 7, p. 28.

55.     In 2022, Oklahoma thereafter sought to execute 25 capital defendants at an accelerated pace, only to conclude that an interval of less than 90 days was unsustainable for the staff or its Department of Corrections. *See* Joint Motion to Set the Phase Three Execution Dates at 90-Day Intervals, *In re the Setting of Execution Dates*, filed January 30, 2024. Exhibit 8.

56.     When Oklahoma first addressed the execution scheduling, the Court of Criminal Appeals approved the 25 executions to occur at least four weeks apart and only on Thursdays. *Id.* The State of Oklahoma then filed a motion seeking to reset execution dates because "the then-current pace of executions—one every four weeks—was not sustainable for DOC." *Id.* The Oklahoma Court of Criminal Appeals granted the motion and rescheduled execution dates for "approximately 60 days apart from each other." *Id.*

57.     A year later, the State of Oklahoma went back to the court to request 90-day intervals. Oklahoma's Department of Corrections noted that there existed "a tremendous burden that executions, and the weeks of process leading up to each execution, place on DOC operations and staff." *Id*. The Oklahoma Attorney General who attended and witnessed all of the executions supported the spacing to ensure that they were conducted in a constitutional manner. *Id*. Acknowledging the "unique nature of the situation," the Court of Criminal Appeals explained that the "setting of

executions in phases may exacerbate unforeseen delays that arise in any individual case." *In Re the Setting of Execution Dates*, filed May 7, 2024. Exhibit 9.

58.    Like Oklahoma, South Carolina has also recently determined that there needs to be a minimum time interval between executions in the state. *See* Amended Order, *Moore et al. v. South Carolina*, Case No. 2024-001373 (S.C. Aug. 30, 2024), Exhibit 10. This ruling stemmed from a motion filed by five death-sentenced inmates requesting that the South Carolina Supreme Court require an interval of no less than 13 weeks between death notices and execution dates because "scheduling executions close in time to one another heightens the risk of serious error during the execution, likely resulting in cruel or unusual punishment." Mot. to Direct or Stay the Issuance of Execution Dates at Intervals of No Less Than 13 Weeks, Exhibit 11, at 1.

59.    While the South Carolina Supreme Court declined to adopt the specifically requested interval, the court "nevertheless recognize[d] that a reasonable interval between the issuance of death notices is warranted" and "direct[ed] the Clerk . . . to issue death notices in a manner to ensure an interval of at least thirty-five days between [them] . . . ." Exhibit 10.

60.    In a similar vein, Missouri limits the number of executions that can be carried out in a one-month period. This prohibition was established by the Missouri Supreme Court in 2016, which it adopted a rule to this effect that states "[t]he department of corrections shall not be required to execute more than one warrant of

18

execution per month." Mo. S. Ct. R. 30.30(f).

61.     In states without express policies against such a practice, the infrequency of dual executions reflects an implicit understanding of the undue stress imposed on all parties involved in the execution process and risk that such a compressed schedule is "sure or very likely to cause serious illness and needless suffering" *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)).

62.     Several former correctional staff have publicly addressed the stress of overseeing and participating in the execution process.

63.     For example, in support of the Oklahoma litigation challenging the carrying out of 25 executions in a single year, nine senior former corrections officers in Oklahoma wrote a letter to the Attorney General urging that the schedule be reassessed. These officials explained that the risk to the staff was "heightened when multiple executions are carried out in rapid sequence" noting that "the prison never really returns to normal operations after the emotional and logistical upheaval of an execution." Exhibit 12. The letter emphasized:

> compressed execution schedule also increases the risk of something going wrong during the execution process because the stress created by each execution compounds the difficulty of an already complex procedure. If even a routine execution can inflict lasting harm on corrections staff, the traumatic impact of a botched execution is exponentially worse.

19

Exhibit 12.

64.    Twenty-three former corrections officials from 16 states also sent a letter to the Arkansas Governor with respect to the eight executions in 2017. These officials warned of the "severe toll on corrections officers' wellbeing" noting that the rapid pace of the executions was "needlessly exacerbating the strain and stress placed on these officers." Ed Pilkington, Eight Executions in 11 days: Arkansas order may endanger staff's mental health, The Guardian (Mar. 29, 2017). Exhibit 13.

65.    Dr. Allen Ault, former chairman of Florida Department of Corrections who has spoken publicly about the impact of executions on staff noting, "As the old saying goes, you dig two graves: one for the condemned, one for the avenger. That's what will happen to this execution team – many of them will figuratively have to dig their own grave too." Exhibit 13.

66.    Retired FSP warden Ron McAndrew has likewise expressed his concerned as to the expediency of executions noting, "pace matters, because executions depend on human beings performing complex, high-risk tasks under extreme pressure." Pamela Colloff, Why is Florida Executing So Many Prisoners?, New York Times Magazine (June 30, 2026). Exhibit 14. McAndrew warns of both the toll the impact of the executions on the staff carrying out the execution, "who carry the memories long after the chamber is cleaned and the state moves on," as

well as the potential for error. Exhibit 14.

## CLAIMS FOR RELIEF

**CLAIM I:    Defendants' Compressed Scheduling of Plaintiffs' Executions Violates Their Rights Under the Fifth, Eighth, and Fourteenth Amendments to the United State Constitution.**

67.    The previous paragraphs of this complaint are incorporated by reference as fully stated herein.

68.    The Eighth and Fourteenth Amendments guarantee litigants the protection from cruel and unusual punishment. U.S. Const. amends. VIII, XIV.

69.    The Eighth Amendment's guarantee applies both at sentencing and in the carrying out of the sentence itself. *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (affirming the Eighth Amendment's prohibition against an execution method that is "sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'").

70.    State officials have a constitutional duty to ensure that death sentences are imposed in a careful and humane manner. Likewise, this Court must take seriously its duty to ensure that the justice system operates with fairness as well as the appearance of fairness, as both are necessary for maintaining the integrity of the judicial system.

71.    Defendants have scheduled and intend to execute Plaintiffs Duckett and Occhicone *within 6 hours of each other on the same day*. This compressed execution

21

schedule poses an unnecessary and objectively intolerable risk of substantial harm that is sure or very likely to occur absent intervention from this Court. The scheduling of Plaintiff Duckett's and Occhicone's execution in this manner also runs afoul of "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

72.     "There is no question that death as a punishment is unique in its severity and irrevocability," *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (citing *Furman v. Georgia*, 408 U.S. 238, 286-91 (1972) (Brennan, J., concurring)), which requires that the procedures for imposing it be implemented in a reasoned, deliberate, and constitutional manner.

73.     As demonstrated in ¶¶ 62-66 above, it is beyond dispute that any execution imposes an extraordinary amount of stress on everyone involved. Scheduling multiple executions in the same day unnecessarily exacerbates this stress and amplifies the risk of error since there is no opportunity for participants to engage in any sort of self-assessment or debriefing before the second execution occurs.

74.     The stress placed on corrections officers and others involved during the dual-execution day likewise heightens physical and mental fatigue, precludes any meaningful post-execution review of Florida's Lethal Injection Procedures, and correspondingly increases the risk that Plaintiffs will suffer during their executions.

75.     Florida's Lethal Injection Procedures demonstrate the intricacies of the

execution process. Each step requires sharp focus and attention to the most minute of details to prevent an irreparable mistake like what happened in Oklahoma with the botched execution of Clayton Lockett in 2014.

76. Because Florida's execution process is shrouded in secrecy and the identities of everyone involved are unknown, Plaintiffs Duckett and Occhicone do not know whether the same execution teams or executioners will carry out both their executions; however, any chance of overlap heightens the risk that grave error will occur and Plaintiffs will unconstitutionally suffer.

77. The Lethal Injection Protocols require, at a minimum, simulations of the execution process on a quarterly basis. Exhibit 1, p. 4 (4). Without more notice than occurred in Plaintiffs' cases that the executions would occur on the same day, it is unlikely that two execution teams had been properly trained, thus the likelihood of the same execution team handling both executions is great.

78. Moreover, preparation for Plaintiffs' executions requires attention to their unique medical conditions and vulnerabilities, including vein viability. Allowing a mere 6 hours in between each execution increases the chance that errors will arise when the execution team attempts to attain venous access. Given that only nine days have passed since Plaintiffs' executions were set for the same date, preparation for their executions is now happening on an overlapping basis without any meaningful consideration of the challenges their individual executions will

23

present.

79. The increased difficulty with maintaining and storing execution drugs for two individuals also increases the chance that the drugs will not be properly maintained resulting in a botched execution.

80. The truncated timeframe between executions provides Defendants with no opportunity to determine whether any errors occurred with Plaintiff Duckett's execution before it proceeds with carrying out Plaintiff Occhicone's sentence.

81. No justifiable explanation exists for executing Plaintiffs on the same day, which will mark the first dual execution using lethal injection in Florida's history. If Defendants proceed with the current schedule, they are doing so in deliberate violation of Plaintiff Duckett's and Occhicone's constitutional rights.

82. Defendants are on notice that conducting two executions in such quick succession is likely to result in objectively intolerable pain and suffering—particularly where there is no protocol in place that accounts for this practice. If Defendants proceed with the current schedule, they are doing so in deliberate violation of Plaintiff Duckett's and Occhicone's constitutional rights.

**CLAIM II: Defendants' Scheduling of Plaintiffs' Executions Violates their Rights to Equal Protection Under the Fifth and Fourteenth Amendments to the United State Constitution.**

83. The previous paragraphs of this complaint are incorporated by reference as fully stated herein.

24

84. The Fifth, Eighth and Fourteenth Amendments guarantee litigants due process and equal protection of the laws. *See* U.S. Const. amends. V, VIII, XIV.

85. Defendants' execution schedule flouts the fundamental fairness interests enshrined in the Fourteenth Amendment's concept of Due Process. *See Carmell v. Texas*, 529 U.S. 513, 533 (2000) ("[T]here is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.").

86. While the United States Supreme Court has determined that challenging state actions under equal protection is "the usual last resort of constitutional arguments" the Court has determined review of such claims that "involves one of basic civil rights" is appropriate. *See Skinner v. State of Okl. ex. rel. Williamson*, 316 U.S. 535 (1942).

87. Defendants' scheduling of the executions of Plaintiff Duckett and Plaintiff Occhicone on the same day violates due process and equal protection, which the State of Florida has no rational basis for doing. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted); *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (requiring an "extremely high degree of similarity" between the plaintiff and those similarly situated).

88. The Equal Protection Clause guarantees that the State will treat

similarly situated individuals equally. *See F.S. Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920) ("all persons similarly circumstanced shall be treated alike"). And the Due Process Clause mandates "fundamental fairness" when the State extends procedural benefits to prisoners, even where those benefits or protections are not themselves constitutionally required. *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). But in wielding its most solemn and awesome power, the power to execute its own citizens, the State has eschewed both equality and fairness.

89.     The State of Florida has not scheduled two executions in one day in over 60 years. Nor have any capital defendants been executed within seven days of one another since 2000. Since the advent of the modern death penalty, every person scheduled in Florida has been scheduled for individual execution days.  By scheduling Mr. Duckett's and Mr. Occhione's executions on the same day, contrary to every other individual scheduled for execution post-Furman, Defendants have created two classes of death row prisoners. This arbitrary and disparate treatment – particularly in a matter of life and death such as determining the conditions under which the prisoners will die – is odious to the Constitution and this Court should not countenance it.

90.     There is no question—as outlined in more detail in Claim I—that Plaintiffs will suffer injury from having their executions scheduled on the same day that defendants with executions that are spaced out will not suffer. By scheduling

them on the same day, the Defendants create a distinct, disfavored class of death-row prisoners in violation of the Equal Protection and Due Process Classes.

91. As a general matter, to state a claim for relief under the Equal Protection Clause, a plaintiff must first "show that the State will treat him disparately from other similarly situated persons." *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (quotation omitted). A plaintiff must also show that such disparate treatment either burdens a fundamental right, targets a suspect class, or is not rationally related to a legitimate government interest. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985). Mr. Duckett and Mr. Occhicone can make that showing here.

92. First, the plaintiffs, are without question being treated disparately from all other men who have been executed by the State of Florida during the modern day, as is outlined more clearly in Claim I. For example, by having their executions on the same day, they are at risk of an execution team who is exhausted or distracted from trying to keep up with separate protocol in two cases. They also are at risk of having their drugs mixed up because they are being stored together, or, of having their drugs improperly stored, because the defendants do not have the necessary facilities to individually and properly store drugs for two executions on one day. Plaintiff Duckett is the only capital defendant in Florida under the current death watch policies who will not be permitted a final visit with his family on the day of

his execution. To Plaintiffs' knowledge, no other capital defendant has been given less than two weeks' notice of their execution, as was Mr. Duckett, in more than two decades.

93.     In contrast, the other class of men - the death row prisoners whose executions have been spread out – faced none of these issues. There can be no clearer example of disparate treatment. *See, e.g.*, *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("[The Equal Protection Clause] keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."); *see also Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918) ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.").

94.     Second, Plaintiff's equal protection claim is entitled to heightened scrutiny. Plaintiffs and all those on death row retain a fundamental right to life under the Fourteenth Amendment to the United States Constitution. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and concurring in the judgment)[3] ("A prisoner under a death sentence remains a living

---

[3] Justice O'Connor's concurring opinion in *Woodard* provided the holding for that case. *See Gissendaner v. Comm'r, Georgia Dep't of Corr.*, 794 F.3d 1327, 1331 (11th Cir. 2015).

person and consequently has an interest in his life."). *Cf. Arthur v. Comm'r, Alabama Dep't of Corr.*, 680 F. App'x 894, 916–17 (11th Cir. 2017) (unpublished) (Wilson, J., dissenting) ("fundamental right[s] … exist[] until a death row prisoner's life is taken[,] [t]he right does not vanish when a prisoner enters the execution chamber and the state begins to tinker with the machinery of death").

95.   Third, and alternatively, Defendants disparate treatment of Plaintiffs with other death sentenced individuals whose executions have been spaced out is without any legitimate or penological interest and must fail even under rational basis review.

96.   Rational basis review is deferential, but it is not "toothless." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981); *see also Zobel v. Williams*, 457 U.S. 55, 65 (1982) (finding equal protection violation under rational basis review because the State "show[ed] no valid state interests which are rationally served by the distinction it makes between citizens who established residence before 1959 and those who have become residents since then"). And Defendants' distinction between the Plaintiffs and everyone else who has faced execution in the modern era of the death penalty is not rational.

97.   Defendants' arbitrary line drawing between these two classes of individuals is not rationally related in any way to legitimate state interest and this Court must intervene.

29

**CLAIM III: The Compressed Scheduling of Plaintiffs' Executions Deprive Them of Their Right of Access to Courts in Violation of the First, Fifth, and Fourteenth Amendments.**

98.    The previous paragraphs of this complaint are incorporated by reference as fully stated herein.

99.    The First, Fifth, and Fourteenth Amendments guarantee litigants and criminal defendants access to courts and due process. *See* U.S. Const. amends. I, V, XIV.

100.    The Due Process Clause of the Fourteenth Amendment guarantees that "no State shall . . . deprive any person of life, liberty, or property without due process of law." Amend. XIV, U.S. Const. Likewise, "one of the basic tenets of Florida law is the requirement that all proceedings affecting life, liberty, or property must be conducted according to due process." *Scull v. State*, 569 So. 2d 1251, 1252 (Fla. 1990) (citing Art. 1, § 9, Fla. Const.).

101.    "Whether acting through its judiciary or through its legislature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless there is, or was, afforded to him *some real opportunity to protect it*." *Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 U.S. 673, 682 (1930) (emphasis added). "At a minimum," due process "require[s] that deprivation[s] of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Armstrong v.*

*Manzo*, 380 U.S. 545, 550 (1965) (quoting *Mullane v. Cent. Hannover Bank & Trust Co.*, 339 U.S 306, 313 (1950)).

102.   "[A]n essential principle of due process is that a deprivation of life . . . 'be preceded by notice and opportunity for **hearing appropriate to the nature of the case.**'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (noting") (quoting *Mullane*, 339 U.S. at 313) (emphasis added).

103.   As the Supreme Court held in *Mathews v. Eldridge*, "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and *in a meaningful manner*." 424 U.S. 319, 333 (1976) (quoting *Armstrong*, 380 U.S. at 553) (emphasis added).

104.   Nowhere can these principles be more important than in a capital case, where the Supreme Court has repeatedly emphasized that the Eighth Amendment requires a heightened degree of reliability in the process. *See, e.g., Herrera v. Collins*, 506 U.S. 390 (1993); *McKoy v. North Carolina*, 494 U.S. 433 (1990); *Loudermill*, 470 U.S. at 542 (quoting *Mullane*, 339 U.S. at 313) (reiterating that the due process requirements of notice and opportunity must be "appropriate to the nature of the case"); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

105.   Under this right, the State must make available the tools necessary for

31

prisoners to obtain meaningful access to available judicial remedies. *Bounds v. Smith*, 430 U.S. 817, 828 (1977). State law must ensure that prisoners like Plaintiffs Duckett and Occhicone have "adequate, effective, and meaningful" access to postconviction remedies in order to vindicate this right. *Id.* (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to ensure their constitutional right of access to courts be upheld).

106.   The court's "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)). This principle applies to all lower courts—both state and federal—given the fact that "death is different." *See also Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority it so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."); *Asay v. State*, 210 So. 3d 1, 18 (Fla. 2016) ("Both this Court and the Supreme Court have recognized that 'death is different.'") (citations omitted).

107.   To that end, capital litigants must be given the opportunity to raise claims as they arise. The Eighth Amendment is not fulfilled after sentencing, both the imposition of a death sentence *and* the process of carrying out an execution must withstand constitutional scrutiny.

> If the Constitution renders the fact *or timing* of his execution contingent upon establishment of a further fact

32

> . . . "then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being."

*Herrera*, 506 U.S. at 405-06 (quoting *Ford*, 477 U.S. at 411).

108. Factual determinations related to the constitutionality of a person's execution are "properly considered in proximity to the execution." *Id.* at 406 (noting competency to be executed determination is more reliable near time of execution whereas guilt or innocence determination becomes less reliable). In other words, whether the carrying out of a death sentence violates the Eighth Amendment depends on the facts existing after a death warrant is signed and the determination of these facts requires *increased reliability*.

109. The Eighth Amendment requires a principled way to distinguish between who is executed by a state government *and* how much time they are afforded to investigate and present their claims under warrant. This is particularly abhorrent when the end result is the ultimate penalty—actual death.

110. As alleged above, Plaintiff Occhicone's execution was scheduled on June 26, 2026. At the time, Plaintiff Duckett did not have an execution date.

111. Plaintiff Duckett was made aware on July 14 that his execution had been rescheduled to the same day as Plaintiff Occhicone, just 6 hours earlier.

112. Defendant's scheduling fails to provide these litigants a meaningful time or manner to investigate and raise any challenges. Both Plaintiffs had less than

33

two 2 full weeks from the execution date to assert challenges to the scheduling, which until July 14, 2026, had not occurred in Florida in 62 years and has never occurred under the lethal injection protocol.

113. Because FDOC's protocol does not contemplate same-day executions and because it has never occurred under the Lethal Injection Protocol, neither Plaintiff Duckett nor Plaintiff Occhicone had any way of knowing that the injury could occur, so as to raise a challenge prior to July 14, 2026 at 3:02 p.m.

114. Likewise, because of the secrecy laws surrounding the execution process, neither Plaintiff has a way to ensure that concerns of the constitutional violations due to the compressed schedule will not occur. Thus, Plaintiffs are required to file suit and challenge the procedures and seek discovery, all within a compressed time. This has impeded their access to courts.

115. Florida's failure to schedule executions in a reasonable time and allow litigants to exhaust claims that arise under warrant runs afoul to the Constitution and the very heart of due process.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

116. Plaintiffs do not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because this lawsuit does not challenge prison conditions and because there are no administrative remedies available that could provide redress for the challenged violations of his constitutional

rights. Moreover, in the past, Defendants have rejected grievances concerning the state's method of execution.

117. Nevertheless, Plaintiff Duckett filed grievances with Defendant Polk and Florida State Prison challenging the scheduling of his execution. Because his time to file the instant challenge was unnecessarily truncated, Plaintiff Duckett's grievances remain pending as of the filing of this action. Any challenge to the fact that Plaintiff Duckett's grievance remains pending must fail as Defendant's scheduling of the executions with so little time has created the instant scenario and deprived Plaintiffs of an "available" administrative remedy under *Ross v. Blake*, 136 S. Ct. 1850 (2016).

## PRAYER FOR RELIEF

118. For the reasons, Plaintiffs James Aren Duckett and Dominick Occhicone respectfully request this Court:

1. Enter a declaratory injunction under 28 U.S.C. § 1983 that Defendants' plans to execute Plaintiffs Duckett and Occhicone on the same day violates their rights under the First, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution;

2. Grant injunctive relief to enjoin the Defendants from executing Plaintiffs Duckett and Occhicone in such a manner that fails to comport with the First, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution; and

3. Issue any further relief as it seems just and proper.

Dated: July **, 2026

Respectfully Submitted,

Counsel for Mr. Duckett:

/s/ Brittney N. Lacy
BRITTNEY LACY
Assistant CCRC-South
Fla. Bar No. 116001
lacyb@ccsr.state.fl.us
ccrcpleadings@ccsr.state.fl.us


 /s/ Courtney M. Hammer
COURTNEY M. HAMMER
Assistant CCRC-South
Fla. Bar No. 1011328
hammerC@ccsr.state.fl.us

CAPITAL COLLATERAL
REGIONAL COUNSEL-SOUTH
110 SE 6th Street, Suite 701
Fort Lauderdale, FL 33301
Tel. (954) 713-1284

/s/ Mary E. Wells
MARY ELIZABETH WELLS
Fla Bar. No. 0866067

Law Office of M.E. Wells
623 Grant Street SE
Atlanta, GA 30312
mewells27@comcast.net

Counsel for Mr. Occhicone

/s/ Ali A. Shakoor
ALI A. SHAKOOR
Florida Bar No. 0669830
Assistant CCRC
shakoor@ccmr.state.fl.us


/s/ Debra Roganne Bell
DEBRA ROGANNE BELL
Florida Bar No. 0973068
Assistant CCRC
bell@ccmr.state.fl.us


/s/ Mahham Syed
Mahham Syed
Florida Bar No. 1049535
Assistant CCRC
syed@ccmr.state.fl.us

CAPITAL COLLATERAL
REGIONAL COUNSEL-
MIDDLE REGION
12973 N. Telecom Parkway
Temple Terrace, Florida 33637
T: 813-558-1643

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by electronic service, via email, to all named Defendants and Assistant Attorney General Charmaine Millsaps this 23 day of July, 2026.

*/s/ Brittney N. Lacy*
BRITTNEY N. LACY
Assistant CCRC-South

37