THE STATE OF SOUTH CAROLINA
IN THE SUPREME COURT

_____

Case Nos. 2001-021895; 2002-024388; 2006-038802;
2007-045260; 2002-023546

_____

Richard Bernard Moore, Brad Keith Sigmon,
Freddie Eugene Owens, Mikal D. Mahdi, and Marion Bowman, Jr.
*Movants*,

v.

STATE OF SOUTH CAROLINA,
*Respondent*.

_____

MOTION TO DIRECT OR STAY THE ISSUANCE OF EXECUTION DATES AT
INTERVALS OF NO LESS THAN 13 WEEKS.

_____

Come now Richard Bernard Moore, Brad Keith Sigmon, Freddie Eugene Owens, Mikal Mahdi, and Marion Bowman, Jr. ("Movants"), South Carolina prisoners whose death sentences were affirmed through federal habeas corpus proceedings. Assuming the Court deems it appropriate to set execution dates after its decision in *Owens v. Stirling*, Case No. 2022-001280; Opinion No. 28,222 (S.C. July 31, 2024)[1], Movants move this Court to direct or stay the issuance of execution notices to ensure a reasonable interval of no fewer than 13 weeks (or 91 days) before and between execution dates. The basis for this request is threefold. First, scheduling executions close in time to one another heightens the risk of serious error during the execution, likely resulting in cruel or unusual punishment. Second—as the accounts of South Carolina's prior execution team members illustrate, and as Oklahoma realized after attempting the expedited resumption of capital

_____

[1] References hereafter will be to the Slip Opinion ("Op.").

punishment after a lengthy pause—conducting multiple executions in a compressed time period will overburden the corrections staff involved in the process, and exact a punishing toll on their physical and mental health while further heightening the risk of a cruel or unusual execution. Finally, scheduling executions at a more frenetic pace will result in hurried litigation and adjudication of any critical concerns that arise during the election and execution processes, while affording a reasonable interval before and between executions to permit the court system to address any final matters that death-sentenced prisoners may raise in an orderly and thorough fashion. *See, e.g., Butler v. State*, 302 S.C. 466, 468, 397 S.E.2d 87, 88 (1990) (granting a writ of *habeas corpus* filed in its original jurisdiction because of a constitutional "violation, which, in the setting, constitutes a denial of fundamental fairness shocking to the universal sense of justice"); *Tucker v. Catoe*, 346 S.C. 483, 495, 552 S.E.2d 712, 718 (2001) (granting habeas relief in its original jurisdiction due to a combination of errors "shocking to the universal sense of justice").

Movants ask the Court to consider these matters in the context of safeguards established by the Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 3 and 15 of the South Carolina Constitution.

## I.        Relevant procedural history

South Carolina last carried out an execution on May 6, 2011, with the lethal injection of Jeffrey Motts. At the time of Mr. Motts' execution, South Carolina's default method of execution was lethal injection, although the condemned prisoner could choose the electric chair.

On May 14, 2021, the South Carolina Legislature amended its statute to make the electric chair the default method of execution, with the prisoner permitted to elect between that method or, if available, lethal injection or the firing squad. S.C. Code Ann. § 24-3-530(A).

Following a trial in August of 2022, a South Carolina Circuit Court issued a declaratory judgment finding that execution by firing squad or the electric chair, and section 24-3-350 as amended, violated the state constitution. Following appeal and oral arguments, this Court ruled on July 31, 2024, that section 24-3-350 and the methods of executions it provides are constitutional. Per the statute and this Court's opinion, if this Court determines that executions should resume, its clerk will issue a notice of execution on a Friday, with the execution to be "duly carried out" on the "fourth Friday after the receipt of such notice." S.C. Code Ann. § 17-25-370. Five days after the notice issues, the South Carolina Department of Corrections (SCDC) must certify the availability of the statutorily authorized methods of execution. The prisoner must elect between these three methods of execution eight days later—exactly two weeks before his execution date.

The five movants in this action have completed the ordinary course of their appeals and are eligible for execution.

## II.    Establishing an appropriate schedule for executions will protect Movants' statutory and due process rights.

This Court predicated its decision in *Owens* on the assumption that, "[u]nder the choice provisions of section § 24-3-530, a condemned inmate in South Carolina will *never* be subjected to execution by a method he contends is more inhumane than another method that is available." Op. at 39 (emphasis added). An accelerated execution schedule would threaten that premise.

Imagine the following scenario (consistent with this Court's historical practice): four inmates are given execution dates on four consecutive Fridays. Under S.C. Code Ann. § 24-3-530(C), each of these inmates would be required to elect their execution method fourteen days prior to their execution date. Because execution dates are set "the fourth Friday" after the Clerk of the Supreme Court issues an execution notice, the second and third inmates would be required to elect their method prior to the execution of the first. As South Carolina's authorized methods of

3

execution are either antiquated or entirely novel, the question of which is the "more inhumane" has yet to be informed by their actual use. If a method is used and is botched, or otherwise reveals itself to be "more inhumane," a compressed execution schedule might subject a prisoner to execution by a method that they would never have chosen had the execution that revealed its "inhuman[ity]" occurred before their election date.

This would not only defeat this Court's central premise in Owens; it would also implicate the prisoner's due process rights. The concept of due process "expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty," and courts must therefore look to a "a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 24-25 (1981). When the government seeks to deprive a citizen of the most fundamental of all rights—the right to life—procedural due process requires that the state provide sufficient process to fully protect the interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 323 (1976). In this circumstance, the right of election codified in section 24-3-530, and recognized by Owens as integral to the constitutionality of that statute, can only be protected if the execution schedule does not operate to render the prisoner unable to avoid being "subjected to execution by a method he contends is more inhumane than another method that is available." Op. at 39. Executions scheduled close in time would yield a high risk of error because it has been a significant time since the last execution, one method is antiquated, and the other two are untested.

Because all three methods are either untested or more than a decade out of use, sufficient time should be provided before and between executions for the correctional staff to learn and, as needed, to adjust the protocols in light of knowledge obtained from executions, and so that inmates

4

under sentence of death can make an informed election of an execution method based on prior executions. Each of the three methods will be unfamiliar to the correctional staff charged with carrying them out. No one in South Carolina has ever been executed using the firing squad; its protocols were not developed until 2022. The last execution by lethal injection occurred in 2011 and used a three-drug protocol; the current protocol requires a single dose of pentobarbital and has never been used in South Carolina. "Since the advent of death by lethal injection in 1995, very few inmates have been executed in the electric chair in South Carolina." Op. at 23. No executions by electrocution have been carried out in South Carolina since 2008.

As this Court has acknowledged, "the history of capital punishment is replete with incidents of failed executions." Op. at 22. As is capital punishment's future: "The inescapable reality [is] that an execution by any method may not go as planned—that it will be 'botched.'" *Id.* at 23. The certainty of that risk argues for precautions. If the Court deems it appropriate to schedule executions, those dates should be set at least ninety days apart to ensure that corrections staff have sufficient time to carefully plan for each execution, to minimize the risk of error, and to address any irregularities that occur during one execution prior to the subsequent execution.

Movants respectfully suggest that it behooves everyone involved—from the Movants, to corrections staff, to the South Carolina judicial system more broadly—to ensure that any unintentional errors or accidents, particularly those that may inflict unnecessary pain, are not repeated during later executions. By eschewing an accelerated schedule for executions, the Court can ensure that "state officials [have the capacity to carry] out their duties under the death warrant in a careful and humane manner." *State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 462, 67 S. Ct. 374, 375, 91 L. Ed. 422 (1947). If repetition of an accident could be prevented through

sufficient time for investigation and the implementation of additional precautions or updated protocols, the failure to provide such time could pose an imminent danger of needless suffering.

### III. Similar circumstances in Oklahoma necessitated an interval between executions.

With South Carolina poised to resume executions for the first time in thirteen years, recent events in Oklahoma illustrate the concerns addressed in this motion. Shortly after resuming executions after a hiatus of nearly seven years, Oklahoma attempted to accelerate the pace of executions, only to conclude that an interval of less than ninety days was unsustainable for the staff of its Department of Corrections. *See* Joint Motion to Set the Phase Three Execution Dates at 90-Day Intervals, *In Re the Setting of Execution Dates*, filed January 30, 2024 (Attachment A). In June 2022, the state of Oklahoma notified the Oklahoma Court of Criminal Appeals that there were twenty-five inmates who were eligible for execution. Initially, the request was for executions to occur at least four weeks apart and only on Thursdays. *Id.* This request was granted. *Id.* In January 2023, the State of Oklahoma filed a motion seeking to reset execution dates because "the then-current pace of executions—one every four weeks—was not sustainable for DOC." *Id.* The Oklahoma Court of Criminal Appeals granted the motion and rescheduled execution dates for "approximately 60 days apart from each other." *Id.*

In January 2024, the State of Oklahoma requested ninety-day intervals between executions. Department of Corrections leadership noted that there existed "a tremendous burden that executions, and the weeks of process leading up to each execution, place on DOC operations and staff." *Id*. The Oklahoma Attorney General attended and witnessed all of the executions to ensure that they were conducted in a constitutional manner. *Id*. He interviewed correctional staff and leadership both before and after executions, granting him "unprecedented insight into the burden

imposed on DOC personnel by each execution." *Id*. In requesting ninety-day intervals, the Attorney General explained:

> an enlarged spacing, of 90 days, is suggested not as a matter of convenience, but only after careful consultation and deliberation and out of the Attorney General's solemn duty to ensure that executions are carried out constitutionally and in compliance with the execution protocol.

*Id*. Participating as a member of the execution staff is strictly voluntary in Oklahoma, which is similar to the situation in South Carolina; thus, the impact and burden of executions on those staff members is critical because "staff volunteers may withdraw from performing their assigned duties specific to the execution." *Id*.

After a hearing, the Oklahoma Court of Criminal Appeals granted the motion to set executions ninety days apart. *See* Order on Joint Motion to Set the Phase Three Execution Dates at 90-Day Intervals, *In Re the Setting of Execution Dates*, filed May 7, 2024 (Attachment B). Acknowledging the "unique nature of the situation," the Court of Criminal Appeals explained that the "setting of executions in phases may exacerbate unforeseen delays that arise in any individual case." *Id*.

Like Oklahoma, South Carolina has had an extended period when no executions have occurred and has multiple persons under death sentences who are eligible for execution. South Carolina law directs the setting of an execution for "the fourth Friday" after the Clerk of this Court issues an execution notice, S.C. Code Ann. § 17-25-370, but it does not restrict this Court's ability to establish intervals before and between executions by issuing stays or directing when the Clerk issues the execution notice.[2]

---

[2] If this Court wished to establish an interval of thirteen weeks between executions, it could do so simply by issuing execution notices thirteen weeks apart, which would preserve *Owens*'s timetable for the Department of Corrections' certification of the available methods and the due date for any motions for stay of execution filed in this Court.

When Oklahoma began executing people at four-week intervals, that pace took its toll, resulting in two separate orders to slow down the pace of executions, first to sixty-days apart, then ninety-days. Moreover, given the election requirements, the South Carolina Department of Corrections will only have a roughly two-week notice period to prepare for an execution after the election is made or the date for an election ends. Limiting executions to, at the very least, ninety-day intervals, would ease the burden on correctional leadership and staff who must carry out executions and safeguard the rights of death-sentenced inmates to a constitutionally compliant execution process.

IV.    **Assuming the Court schedules executions, it should consider the likelihood of a negative impact on corrections staff.**

Those selected to be on execution teams are charged with taking the life of another human being—often one they have known for years. The gravity of this matter is undeniable. "Despite the stark conditions, death rows are still places where human connections form."[3] Execution team members are not the only individuals impacted by this substantial undertaking. There are correctional officers who have worked beside these incarcerated persons for years, responsible for maintaining their safety and security. Medical staff, tasked with keeping these individuals alive and well, even under a death sentence. Maintenance crews, who ensure execution chamber equipment is operational. Custodial staff, who may be inmates themselves, tasked with cleaning the execution chamber following an execution. All of these people, and others, can be profoundly impacted by executions.

---

[3] Penal Reform Int'l, *Prison guards and the death penalty*, (2015), available at https://cdn.penalreform.org/wp-content/uploads/2015/04/PRI-Prison-guards-briefing-paper.pdf (last visited Aug. 14, 2024) (Attachment C).

Jim Harvey, former Warden at Broad River Correctional Institution who oversaw thirteen executions, has acknowledged the hardship participating in executions has caused him, his family, and those he supervised.[4] Harvey was "consumed by stress for weeks before each execution." *Id.* Even Harvey's wife suffered depressive episodes as a result of her husband's involvement in executions. *Id.*

Craig Baxley and Terry Bracey, former execution team members at SCDC have been diagnosed with depression and Post-Traumatic Stress Disorder since leaving their jobs. *Id.* When carrying out executions, Baxley succumbed to feelings of worthlessness and binge drinking, while Bracy was haunted by the sights and smells of electrocutions, and came to view himself as a serial killer. *Id.*  A third member of their execution team has died by suicide. *Id.*

Ron McAndrew, former Warden of the Florida State Penitentiary has experienced the effects executions can have on those who participate.[5] McAndrew has acknowledged that despite "meticulous preparation" for an execution, the likelihood of an execution going wrong is ever present, and the likelihood of those involved experiencing trauma is substantially increased. As the Warden who oversaw executions, he witnessed the impacts on his staff: "substance abuse, domestic troubles, depression, even suicide. Some left correctional work altogether." *Id.* When speaking about the use of the firing squad, McAndrew contrasts participating in an execution with participating in an act of war, acknowledging that "[i]t's one thing when armed soldiers . . . must

---

[4] *South Carolina Execution-Team Members Talk of the Debilitating Emotional Toll of Capital Punishment, Former Warden Calls Death Penalty 'Inequitable'*, https://deathpenaltyinfo.org/news/south-carolina-execution-team-members-talk-of-debilitating-emotional-toll-of-capital-punishment-former-warden-calls-death-penalty-inequitable (last visited Aug. 10, 2024) (Attachment D).

[5] Ron McAndrew, *South Carolina Death Penalty is Traumatic for Prison Workers*, THE STATE, (June 6, 2021, 1:00 AM), https://www.thestate.com/opinion/article251900888.html (last visited Aug. 14, 2024) (Attachment E).

use deadly force to subdue an aggressor. It's quite another thing to kill someone who is no longer a threat the others. The burdens state workers are being asked to take on are significant, and unnecessary." *Id.*

Dr. Green Neal, a medical doctor designated as an essential member of the execution team in South Carolina, was in the room during eight executions, and pronounced people dead to certify the executions.[6] As a licensed physician and the medical director of the prison, he found the moral dilemma of participating in the executions of individuals he was once tasked with keeping alive and well so confounding that it silenced him for decades. *Id.*

In addition to the challenges caused by participating in and witnessing executions, ensuring executions are carried out in a manner that limits the possibility for error entails intensive preparation. That preparation becomes even more paramount when implementing a method of execution that has never been used. George Martin, former Warden at Broad River Correctional Institution, oversaw numerous executions and the people involved in carrying them out: the execution team, their alternates, chaplains, maintenance, medical, and human services staff. *Id.* Mr. Martin has discussed the concentrated efforts taken to "refine . . . procedures[s] down to the smallest detail, select . . . team[s] of primary and alternate members for each position, and then practice, practice, practice."[7]

A compressed execution schedule necessarily constrains preparation and practice, Evidence from other jurisdictions provides insight into the dangers of back-to-back executions.

---

[6] Chiara Eisner, *SC Physician Involved in Executions Shares His Experience*, THE STATE, Apr. 26, 2022; https://www.thestate.com/news/state/south-carolina/article260531507.html (last visited Aug. 14, 2024) (Attachment F).

[7] George N. Martin III, *Enforcing the Death Penalty with Competence, Compassion*, CORRECTIONS TODAY, July 1993 (Attachment G).

Justin Jones, the director of the Oklahoma Department of Corrections has acknowledged his fear "that when staff are put under such extreme pressure, they are more likely to make mistakes."[8]

Should the Court move forward with setting execution dates, Movants ask that it take into account the significant degree to which carrying out executions take a toll on prison staff members. Multiple executions in short order will not only amplify this toll, but also increase the risk that overburdened prison staff will make an unintentional error during an execution that will lead to needless, cruel, or unusual suffering.

**V.    A 13-week interval between executions will ensure the thorough and orderly disposition of any final matters that Movants may raise prior to their potential executions.**

As noted above, State officials have a constitutional duty to ensure that death sentences are imposed in a careful and humane manner. Likewise, this Court takes seriously its duty to ensure that the justice system operates with fairness as well as the appearance of fairness. Both are necessary for maintaining the integrity of the court system. *Ex parte Greenville News*, 326 S.C. 1, 4, 482 S.E.2d 556, 558 (1997) (in the context of public trials, noting the State interest in "promot[ing] fairness and the appearance of fairness."). Specifically, this Court has taken great care to establish adequate substantive and procedural safeguards in the adjudication and administration of capital punishment. *See, e.g., State v. Torrence*, 305 S.C. 45, 69, 406 S.E.2d 315, 328 (1991) (Toal, J., concurrence with which a majority joined) (recognizing this Court's ability to act on a writ of *habeas corpus* filed in its original jurisdiction as a final safeguard in capital cases, "where there has been a 'violation, which, in the setting, constitutes a denial of fundamental fairness shocking to the universal sense of justice'" (quoting *Butler v. State*, 302 S.C. 466, 468,

---

[8] Ed Pilkington, *Prison officers traumatized by rate of executions in US death penalty states*, THE GUARDIAN, (Apr. 28, 2024, 7:00 AM); https://www.theguardian.com/world/2024/apr/28/prison-guard-trauma-execution-death-penalty (last visited Aug. 14, 2024) (Attachment H).

11

397 S.E.2d 87, 88 (1990)); *Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53 (1993) (establishing procedures and analysis to be used in adjudicating competency to be executed claims under state law); *In re Stays*, 321 S.C. 544, 471 S.E.2d 140 (1996) (establishing "the procedure and standards to be followed regarding stays of the death sentence" as capital cases move through the system); *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003) (establishing procedures and standards to implement *Atkins v. Virginia*, 536 U.S. 304 (2002), prohibiting execution of persons with intellectual disability). Movants suggest that establishing a reasonable interval between execution dates will preserve both the fairness as well as the appearance of fairness in these capital cases.

An expedited schedule of executions will undercut these duties of care, humanity, and fairness. Unexpected issues may arise as prior executions occur, or new evidentiary discoveries may come to light as end-stage investigations are conducted. But, with an execution (or executions) looming, any consideration or factual development of these issues will be conducted at breakneck speed. Moreover, as both the Movants and their fellow death-sentenced prisoners are largely represented by the same attorneys, the case needs and time demands created by having multiple clients scheduled for execution creates impossible conflicts that can impede representation when it is most needed.

The resumption of executions in South Carolina would be a sober and significant event. Doing so in a rapid and seriatim manner risks an execution proceeding inexorably even where grave misgivings have emerged—perhaps about the method used in the last execution, or evidence of innocence, or a flawed conviction or sentence. A more reasonable interval before and between executions would prevent the consideration of those final concerns from appearing hasty, ill-considered, uninformed, or unfair.

## CONCLUSION

For the reasons contained herein, as well as any additional reasons that may appear to this Court, Richard Bernard Moore, Brad Keith Sigmon, Freddie Eugene Owens, Mikal Mahdi, and Marion Bowman, Jr., request that, if this Court schedules executions, it stay or direct the issuance of execution notices to ensure intervals of no less than thirteen weeks between executions.

Respectfully submitted,

*/s/Lindsey S. Vann*
Lindsey S. Vann (No. 101408)
Rosalind S.D. Major (No. 106017)
JUSTICE 360
900 Elmwood Avenue, Suite 200
Columbia, SC 29201
*Counsel for Richard Moore*

*/s Joshua Snow Kendrick*
Joshua Snow Kendrick (No. 70453)
KENDRICK & LEONARD, P.C.
 P.O. Box 6938
Greenville, SC 29606

Gerald W. King, Jr.
Chief, Capital Habeas Unit
For the Fourth Circuit
Gerald_King@fd.org
*Counsel for Brad Keith Sigmon*

*/s Gabrielle Amber Pittman*
Gabrielle Amber Pittman (No. 71771)
Deputy Chief, Capital Habeas Unit
For the Fourth Circuit
G_Amber_Pittman@fd.org

129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 688-6946
*Counsel for Brad Keith Sigmon, Freddie Eugene Owens,*
*Mikal D. Mahdi, and Marion Bowman, Jr.*

August 21, 2024.

13